Carl Maier Syndicate, by J. C. Jessen, Sole Trustee v. Commissioner.
Carl Maier Syndicate v. Commissioner
Docket No. 3159.
United States Tax Court
1946 Tax Ct. Memo LEXIS 75; 5 T.C.M. (CCH) 821; T.C.M. (RIA) 46226; September 25, 1946
*75 Frank T. Horner, Esq., 433 S. Spring St., Los Angeles 13, Calif., for the petitioner. E. A. Tonjes, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: This is a proceeding to obtain redetermination of deficiencies declared by the Commissioner in petitioner's income and declared value excess profits taxes for the years 1939 and 1940 as follows: Declared
Value Excess
Year
Income Tax
Profits Tax
1939
$3,709.70
$1,619.87
1940
5,839.08
1,595.75
Totals
$9,548.78
$3,215.62
The questions involved are as follows: (1) Was petitioner an association taxable as a corporation during the calendar years 1939 and 1940? (2) Was petitioner entitled to the deduction for depreciation claimed in the years 1939 and 1940? (3) Was petitioner entitled to the deduction for depletion claimed for the years 1939 and 1940? The fourth question which was originally involved in this action, pertaining to a bad debt loss, has been adjusted by the respondent allowing the deduction. Findings of Fact On July 21, 1922, one Carl Maier obtained an assignment from the Cal-Mex Oil & Refining Company of a lease on certain *76 prospective oil producing property. He procured the money for the development of this property by selling production shares to various individuals with whom he entered into an agreement to assign his lease to a trustee in consideration of retaining to himself 35 of these production shares. These production shares, when issued by the trustee and accepted by the investors, were designated "certificates of beneficial interest in Carl Maier Syndicate." Before these shares were issued Carl Maier and Gilbert Beesemyer, who represented themselves as trustees, filed an application with the State Corporation Department of the State of California for permission to issue these certificates. This permission was granted to issue 125 "equal interests", 90 of which were to be sold at a price of $1,000 and the remaining 35 to be placed in escrow in the name of Carl Maier. The permit required that a copy of the permit be printed on the backs of the subscription blanks. No more than $5,000 aggregate value of the "securities herein" could be sold to any one person. The pertinent parts of the agreement between Carl Maier and the subscribers to these securities or "equal interest" is as follows: AGREEMENT *77 TO PURCHASE AND ASSIGNMENT TO A PRODUCTION SHARE IN THE CARL MAIER LEASE WHERAS, Carl Maier, hereinafter designated as Seller, now owns and holds a lease to drill for oil on the following described property, to-wit: * * *
Whereas, who shall hereinafter be designated as the Purchaser, hereby agrees to purchase a hundred twenty-fifths ( -125) portion of all oil, gas and other hydrocarbons, which according to the terms of the aforementioned Lease, is assigned to said Carl Maier, and to pay therefor, to the Trustee hereinafter designated and for the uses and purposes herein set forth, the sum of Dollars, lawful money of the United States; and WHEREAS, the Seller and Purchaser have agreed as follows: That the Seller shall drill the first well on this Lease, to be called Maier Well No. 1, with money derived from the sale of this and like production shares. * * *
* * * The expense of drilling Well No. 2 or any subsequent wells and placing same on production is to be borne by the owners of production shares pro-rata, to-wit, by Maier and all other owners of such production shares, in proportion to the number of production shares owned by each. The money necessary for the *78 drilling and placing on production of Well No. 2 to be derived from the production of Well No. 1, the initial production of Well No. 1 to be held in trust by the Trustee hereinafter designated until the approximate cost of Well No. 2 is accumulated. A similar plan is to prevail if a third well is drilled. The cost of maintaining the wells on production and all other expense after the wells are placed on production shall also be borne pro-rata by all owners of production shares. It is understood that maintenance implies the cost of keeping the wells on production and will not include executive salaries except trustees fees. The purchaser hereby approves and confirms the appointment of Gilbert H. Beesemyer, of the Guaranty Building and Loan Association of Hollywood, in the City of Los Angeles, Los Angeles County, California, as the Trustee and attorney-in-fact with the irrevocable power of attorney to collect and disburse proportionately all net profits derived from the sale of all oil, gas and other hydrocarbons produced from said wells, or either of them; All money derived from the sale of production shares shall also be held in trust and disbursed by the Trustee for all costs *79 of completing a well to actual production only. Salaries, office expenses, advertising costs or any other expense incidental to the sale of said production shares shall not be deducted from this money. The purchaser hereby vests in said Carl Maier and said Trustee jointly the irrevocable authority to act for him or her on his or her behalf in contracting for the sale of all oil, gas and other hydrocarbons produced by any and all wells on this lease. * * *
NOW, THEREFORE, the said Carl Maier does hereby sell, assign and convey to , the Purchaser, his heirs and assigns forever, a hundred twenty-fifths ( -125) part of his portion of all oil, gas and other hydrocarbons as specified above and in the aforementioned Lease and assignment thereof. In a paragraph of the agreement not quoted the production share owners are referred to as "shareholders" and it is provided that they shall receive payment "in proportion to the number of shares owned by each party." The so-called certificate of beneficial interest in the Carl Maier Syndicate issued by the trustee was declared by the trustee to be "transferable only upon the books of the Carl Maier Syndicate upon endorsement and surrender *80 of this certificate." The petitioner has never been incorporated. On May 4, 1932, the Superior Court of California removed Gilbert H. Beesemyer and appointed J. C. Jessen who is still acting. Neither Beesemyer nor Jessen was ever granted any authority to designate this trust as the Carl Maier Syndicate but such term has been applied to the trustees' certificates since the organization of this trust. From 1923 to 1940, inclusive, petitioner's trustee filed fiduciary returns on Form 1041 with the collector of internal revenue at Los Angeles, California. The Commissioner of Internal Revenue ruled, for all years prior to the calendar year 1936, that the petitioner was not an association taxable as a corporation. During the years 1922 to 1938, inclusive, petitioner acquired depreciable property of the value of $137,723.64. In his fiduciary returns from 1923 to 1940, inclusive, petitioner reported gross income, depreciation and depletion as follows: Calendar
Year
Gross Income
Depreciation
Depletion
1923
$ 36,820.94
$13,649.12
None
1924
62,850.07
15,910.96
None
1925
105,647.07
20,750.96
None
1926
65,809.62
21,185.27
None
1927
52,485.26
21,185.27
None
1928
40,161.19
8,557.90
None
1929
173,989.67
9,730.34
$47,847.16
1930
61,496.76
13,826.58
None
1931
8,058.32
None
None
1932
19,026.00
None
None
1933
10,534.46
None
None
1934
20,910.24
None
None
1935
20,708.15
None
5,694.74
1936
57,310.52
None
None
1937
54,698.12
9,256.00
None
1938
47,691.02
9,256.00
None
1939
67,540.72
23,792.34
10,079.00
1940
67,140.67
5,449.95
17,966.84
*81 The depreciation claimed for the years 1923 to 1938, inclusive, is $143,308.40. On March 28, 1928, petitioner entered into a contract with one J. R. McKinney, which contract was later amended on November 30, 1928, and was assigned to the Sovereign Oil Corporation, whereby McKinney, and later the Sovereign Oil Corporation, agreed to drill a well, paying all the costs thereof and to be paid from the first oil produced; to operate the well and from the proceeds to pay the landowner's royalty, taxes and assessments and all current operating costs and, after having recouped all drilling costs, petitioner was to receive an undivided one half interest in the tangible drilling equipment, together with fifty percent of the net proceeds received from the oil, gas and other hydrocarbon substances produced from the well. In 1935 Sovereign Oil Corporation assigned its interest in the above well to Royalty Service Corporation who owned this interest during the taxable years. During the taxable years the trustees did not actively operate the well. They employed an operator to operate the pumps, store the oil and supervise the gauging and delivery thereof to the purchaser, but the trustees inspected *82 the work of this operator and reserved to themselves the right to change operators at any time. Opinion There does not seem to be any basis in legal principles by which the decisions, in which the question of the taxability of an association as a corporation has been determined, can be harmonized. There are so many "border line" cases in which the distinction seems to rest on the mental attitude of the Court and his reaction to the testimony rather than on any tangible facts which can be classified. In fact, it has been repeatedly held that this question is one of fact to be determined by the trial court and that the laying down of definitive legal rules is not practicable. (5 C.C.A.); Thrash Lease Trust v. Commissioner, (; ; Del Mar Addition (. All of the cases on this question, however, base their conclusions on the principles laid down in . In that case it was held that the prime requisites for the taxing of a trust as *83 an association taxable as a corporation was that the trust should be a medium for the carrying on of a business enterprise and sharing its gains. In the case at bar the Carl Maier Syndicate was most obviously such a medium. Its function was to drill wells, procure operating machinery therefor, remove the oil from the ground, store the same preparatory to delivery, sell it on the open market at terms and prices to be arranged by the trustee, collect the income from the sales, pay all taxes, costs of operation and divide the profits among the "shareholders" in proportion to the production shares which each beneficiary or shareholder owned. To determine whether this "medium for the carrying on of the business enterprise and the sharing of its gains" is taxable as a corporation we must look to the trust agreement as its character is to be determined by the terms of the trust agreement. The fact that the trustees do not exercise all of the powers granted or that they delegate those powers to someone else does not affect the question. Our determination is based solely upon the trust agreement and the answer to the question as to whether or not that trust agreement confers powers on the *84 trust giving it sufficient of the character of a corporation to make the trust taxable as one. We are not interested in those elements in the trust agreement which may also give the trust the character of a joint tenancy, or a partnership, or a joint venture or any other industrial operating unit. The trust may have characteristics of any one or all of these units and still be taxable as an association with corporate powers if it retains sufficient similarity to a corporation to fall in this classification. The Morrissey case, supra, outlines some of these characteristics, the existence of which gives the trust the attributes of a corporation. Are the trustees a continuing body capable of holding title to property similar to a board of directors in a corporation? In the case at bar there is no limitation upon the years of service of the trustee and the fact that there is no provision in the trust agreement for the selection of a successor trustee would certainly have no materiality to the question of whether or not there is a continuing trustee. American Jurisprudence, Vol. 54, page 114, succinctly sets forth this principle where it says: The principle that a court of equity will *85 not let a trust fail for want of a trustee governs by its very nature the appointment of a substitute or successor trustee. In the case at bar when the trustee was found to be incapable of service he was removed by the court and a successor appointed. The failure to provide in the trust agreement for the election of a new trustee does not make the trustee elected a temporary or non-continuing officer. The trustee herein holds title to property and together with one Carl Maier had the "irrevocable authority" to act in all matters pertaining to the sale of the products of the operation. The second attribute is that the trustees must be empowered to act "in much the same manner as directors." In the case at bar the trustee and Carl Maier have all the powers necessary to operate these oil wells and sell the products thereof. In fact, they have more power than the ordinary board of directors because they are not subject to periodic elections or removal by the holders of the production shares except through court procedure. There is no power vested any place for the operation of these wells except in the trustee and Carl Maier. The third attribute is that the medium for the carrying *86 on of a business enterprise and sharing its gains must be secured from operational interference by the death of the owners of beneficial interests. In the case at bar the certificate of the trustee, which is delivered to the beneficial interest owner at the time the trust agreement is signed and received by the trustee and should therefore be considered as a part of the trust agreement, provides that the production shares shall be transferable on the books of the trustee. Thus complete arrangements are made for the transfer of these production shares without any interference whatsoever with the operation of the business. The fourth provision set out in the Morrissey case is that there must be a limitation of personal liability. In the case at bar the initial subscription of the production shareholder is to be used for the drilling and bringing into production of Well No. 1. After that it is provided that all of the profits from Well No. 1 shall be used to drill and bring into production Well No. 2 and that the shareholders shall bear this expense pro-rata. Most obviously the obligation of the shareholder to bear the expense of the production of subsequent wells is that he foregoes *87 his pro-rata share of the profits and not that he is to be called on for any additional contribution out of his own capital. However, even if we assume that this provision in the agreement requires an additional capital contribution from him, the shareholder is protected by the provision that that contribution shall be "pro-rata" and not an unlimited obligation on the shareholder. The shareholder in this trust is very much in the position of a shareholder in a corporation which provides for assessments against the stockholders, or a shareholder in a corporation providing for additional liability up to double the par value of the subscribed stock. Such liability is a far call from the unlimited liability of a partner. Petitioner's counsel accept the case of , as correctly stating the applicable law on this point. The syllabus of this case reads: Trust created to finance and drill oil well, with transferable certificates of beneficial interest, held taxable as "association," not "trust," where trust agreement contemplated continuity and limited liability, and authorized trustees to manage property, pay debts, and sell products of well; *88 fact that beneficiaries did not exercise control not being determinative. Pertaining to these certificates which are held to constitute a limited liability on the part of the certificate holder, the court said: * * * The "certificate of beneficial interest" recited that the party named was the holder of a beneficial interest under the trust agreement in the amount stated and that the same was transferable only upon the books of the trustees, upon indorsement and surrender of the certificate. The trustees were authorized to hold all property and property rights, the legal title to which might vest in them under the trust, to use the moneys deposited by beneficiaries to pay for labor, casing, and other materials incident to drilling and productio,n to manage and protect the trust property, to pay "trust debts," to sell all products of the well, to borrow money upon the credit of the trust, and to sell any "unsold beneficial interests" as they might deem best for trust purposes. There is certainly no attribute set forth in the court's decision on the certificates of beneficial interest in the Combs case that makes those certificates any more declaratory of limited liability than *89 the certificates in the case at bar. We therefore hold that the trust in the case at bar has created a medium for the transaction of business and the sharing of its gains and that such medium has sufficient characteristics of the corporate form to make this trust taxable as a corporation. II. The second question pertains to whether or not petitioner, in the taxable years 1939 and 1940, should be permitted to take deductions for depreciation on its plant and equipment. Petitioner contends that, since this trust was declared to be taxable only as a trust and was therefore not in a position to take a deduction for depreciation prior to 1936, the deductions which it actually did take should not be considered as either allowed or allowable deductions in determining whether the machinery and equipment had been completely compensated for by deductions prior to 1939. The value of all of the equipment purchased prior to 1939 was $137,723.64 and the reserve for depreciation which the trustee had set up on its books was $143,308.40. It would therefore seem to be apparent that all of this machinery and equipment has been fully depreciated as a matter of fact and that it had no actual depreciation *90 value on the books of the trust in 1939 or 1940. To allow additional depreciation as a tax deduction when, as a matter of fact, there was no actual depreciable value to this plant and equipment in the hands of the trustee, would be to permit the trustee to take a deduction for depreciation reserve which would be nothing but a fiction. The petitioner claims, however, that part of the reserve for depreciation included amounts which should be considered as depletion and that therefore the trustee has not actually depreciated this plant and equipment as the books indicate. On this question we can only state that it is the responsibility of the petitioner to prove the incorrectness of the determination of the Commissioner, not by speculation but by evidence sufficient to overcome the presumption. In this case the books of the trustee show that no depletion was claimed and that more than a sufficient reserve was set up for depreciation. Petitioner contends that since this trust was declared to be taxable only as a trust prior to 1936, it had no opportunity actually to make any income tax deductions for depreciation and that therefore it should now be permitted to take deductions for depreciation *91 when it was required to pay an income tax. We do not interpret the statutory provisions permitting deductions for depreciation to be anything other than a salutary provision of the revenue law to permit the income tax payer to conform his net taxable income to the facts. We do not construe the allowance of deductions for depreciation to be merely a creature of the Revenue Code to permit the income tax payer to reduce the amount of his income tax. In this case the machinery and equipment of the Carl Maier Syndicate actually deteriorated and depreciated over the years 1923 to 1938, inclusive, regardless of the bookkeeping method by which that deterioration was recognized. Depreciation is both a physical occurrence and the name of a deduction allowable in arriving at the net taxable income. After the actual physical depreciation has occurred there is certainly no reason for permitting income tax deductions to be taken. We have not been furnished by the petitioner with any legal authorities that would take this case out of the reasoning of the court as set forth in , and we therefore hold that the petitioner *92 is not entitled to any deduction for depreciation during the years 1939 and 1940. III. The third question is as to the right of petitioner to make deductions for depletion growing out of the operation of Well No. 3. In 1939 and 1940 petitioner owned one half of the well equipment and was entitled to practically one half of the "profits" from the operation of the well. Respondent contends that since the petitioner had no interest in this well except the profits arising therefrom, he does not have such an interest in the oil in the ground as would entitle him to make deductions for the depletion of this asset. At the time this case was tried this question was a very earnestly contested one and was very much undecided. However, the question has now been adequately determined in favor of the contentions of the petitioner in the cases of ; and . Without repeating the reasoning of these cases we hold that the petitioner is entitled to depletion deductions for the years 1939 and 1940. Judgment will be entered under Rule 50.